UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) NO. 4:10 CR 00547 HEA |
| v. | ) |
| | ) |
| MOHAMUD ABDI YUSUF, | ) |
|   a/k/a   "Sheikh Hassan," | ) |
|         "Hassan Dhunkaal", | ) |
|         "Mohamoud Yusuf Dhunkaal," | ) |
| | ) |
| Defendant. | ) |

# DEFENDANT'S SENTENCING MEMORANDUM IN OPPOSITION TO APPLICATION OF UNITED STATES SENTENCING GUIDELINE §3A1.4

## Introduction

The present issue involves whether United States Sentencing Guideline § 3A1.4 ("terrorism enhancement") applies to Mohamud Yusuf in connection with the offense of Conspiracy to Provide Material Support to a Designated Foreign Terrorist Organization and Providing Material Support to a Designated Foreign Terrorist Organization, both under 18 U.S.C. § 2339B.  The terrorism enhancement creates crucial results, as here it would raise Mr. Yusuf's potential sentence from a 57 to 71 month imprisonment range up to a 360 to 720 month range.  Presentence Investigation Report 14.  The enhancement only applies "if the offense is a felony that involved, or was intended to promote, a federal crime of terrorism." U.S.S.G. § 3A1.4.  The definition of "federal crime of terrorism" has two conjunctive parts.  First, it is an "offense that is calculated to influence or affect the conduct of government."  18 U.S.C. § 2332b(g)(5)(A).  And second, it is a

violation of certain enumerated offenses, including 18 U.S.C. 2339B.  18 U.S.C. § 2332b(g)(5)(B).  Although Mr. Yusuf's underlying offense is listed in Part B of the definition, the terrorism enhancement does not automatically apply.  It still must meet the first part of the "crime of terrorism" definition and meet the requirement of § 3A1.4 that it "involved, or was intended to promote, a crime of terrorism".  U.S.S.G. § 3A1.4.

The defense files this memorandum in opposition to the Government's request for the application of the terrorism enhancement.  The enhancement is not applicable because Mr. Yusuf's violation of 18 U.S.C. § 2339B arose out of extortion and neither "involved" nor was "intended to promote" a crime of terrorism.  Additionally, Mr. Yusuf's violation does not meet the definition of "crime of terrorism" since it was not "calculated to influence or affect the conduct of government" and there was no "government" in Somalia at the time that could have been influenced or affected.

**Statement of Facts**

Mr. Yusuf's violation of 18 U.S.C. § 2339B stems from him sending $5,000 in 2008 at the need of his friend Duane Diriye. In May of 2008, Duane Diriye asked for Mr. Yusuf's help in raising $5,000 after a person purporting to represent al-Shabaab requested this amount for the purchase of a vehicle.  Guilty Plea Agreement 5.  Al-Shabaab is a designated foreign terrorist organization in Somalia, whose largest source of revenue is the extortion and taxation of Somali businesses and businesspeople.  U.N. Sec. Council, *Report of the Monitoring Group on Somalia and Eritrea pursuant to Sec. Council resolution 1916 (2010)*, ¶ 61, U.N. Doc. S/2011/433 (July 18, 2011) [hereinafter U.N. Report on Somalia].  The U.N. Monitoring Group on Somalia and Eritrea estimates that al-Shabaab makes between $30 million and $60 million per year through the taxation

2

and extortion of two markets alone. *Id.* at ¶66 . In addition, "Al-Shabaab representatives regularly pay visits to…businesses to assess values and to collect taxes." *Id.* at ¶63. These taxes are assessed in multiple ways including as ad hoc contributions for specific military operations; the situation that Mr. Diriye was facing. Id.

At the time of these events Mr. Diriye was a new businessman in Somalia and after being approached he talked to others and learned "that the businessmen in town paid money in that same fashion and to pay that money if I wanted to be safe." Diriye BBC Interview p. 1. Mr. Diriye felt it was necessary to pay the money in order to save his life and turned to Mr. Yusuf for help since he personally did not have that amount. *Id.* Mr. Yusuf agreed to help since the two had been friends for fifteen years and within the Somali culture "the ethical obligation to assist the extended family is absolute." *Violent Islamist Extremism: al-Shabaab Recruitment in America Hearing Before the S. Comm. on Homeland Sec. and Govt'l. Aff.*, 111th Cong 113 (2009) (prepared statement of Prof. Ken Menkhaus, Davidson College). [hereinafter *Violent Extremism Hearing*].

Beginning around May 29, 2008, Mr. Yusuf began raising money and making preparations to send the money to Somalia. Guilty Plea Agreement 6. During this process Mr. Yusuf utilized "coded language" when discussing al-Shabaab with others. Guilty Plea Agreement 4. The use of "coded language" is a common practice amongst all Somalis as a matter of safety from al-Shabaab itself. Diriye BBC News Interview 3. Within the context of raising the money, figuring out how to get it to Somalia and when talking to purported al-Shabaab members, he also discussed the actions of al-Shabaab in Somalia. Guilty Plea Agreement 6-7. Between June 2008 and August 2008, Mr. Yusuf sent $5,000 to Somalia in a series of five total transactions. Guilty Plea Agreement 6-8.

3

Besides the money going to insurgents in Somalia, Mr. Yusuf attempted to direct that the last $2,000 go to displaced persons and wounded people in area hospitals.  Guilty Plea Agreement 7.   Mr. Yusuf was subsequently arrested on November 1, 2010 for this offense.  Presentence Investigation Report 9.

*Background on Somalia*

Since 1991, Somalia has not had a "functioning government in Mogadishu that effectively rules the entire country.  This lack of governance has resulted in Somalia being engaged in a chaotic civil war." *Assessing the Consequences of the Failed State of Somalia: Hearing Before the Subcomm. on Afr., Global Health, and Hum. Rts. and Subcomm. on Terrorism, Nonproliferation, and Trade of the H. Comm. on Foreign Aff.*, 112th Cong. 1 (2011) (statement of Hon. Christopher H. Smith, Chairman, Subcomm). [hereinafter *Failed State Hearing*].  The "lack of governance" in Somalia began in 1991 when the dictatorship of Mohammed Said Barre was overthrown.  The Barre dictatorship has been described as "the last entity that can be plausibly described as 'the government of Somalia'". *Failed State Hearing, supra* at 40 (prepared statement of Dr. J. Peter Pham, Dir., Michael S. Ansari Africa Center).  Since that time, there have been fourteen attempts to establish a government but all have failed and "the country is still fragmented into multiple fiefdoms." *Id.*

In 2004, the Transitional Federal Government ("TFG") was created but has proven ineffective and has been described as " 'not a government by any common-sense definition of the term: it is entirely dependent on foreign troops...to protect its small enclave in Mogadishu, but otherwise administers no territory; even within this restricted zone, it has shown no functional capacity to govern, much less provide even minimal

4

services to its citizens'." *Failed State Hearing, supra* at 41 (prepared statement of Dr. J. Peter Pham). Additionally, in 2005 groups within the TFG began to splinter turning the TFG into just "one party in an increasingly brutal civil war." Ken Menkhaus, Enough Project, Somalia: A Country in Peril, a Policy Nightmare, 11 (2008), available at: http://www.enoughproject.org/files/somalia_rep090308.pdf.

In 2006, the Islamic Courts Union ("ICU"), a group of moderate and hard-line Islamic fundamentalists, gained significant control in Somalia as they "controlled and governed all of Mogadishu and most of south-central Somalia." *Id.* at 2. Initially, it appeared that the ICU was poised to end "Somalia's long nightmare of state collapse." *Violent Extremism Hearing, supra* at 106 (prepared statement of Prof. Ken Menkhaus). The initial success of the ICU provided "governance that Somalis had not seen in a generation", causing most Somalis, regardless of their political or religious ideology, to become enthusiastic about the ICU. *Id.* However, the ICU ultimately failed to maintain control as it became involved in an internal struggle between its moderate and hard-line factions. Ken Menkhaus, Enough Project, *supra* at 2. In December 2006, the ICU ultimately fell apart after Ethiopia conducted a military operation against the ICU and occupied the capital of Mogadishu. *Violent Extremism Hearing, supra* at 107. The TFG moved back into Mogadishu after the Ethiopian offensive ended. *Id.*

However, the TFG was still unable to provide governance and the reconfiguration of power resulted in more suffering for the Somali population. Ken Menkhaus, Enough Project, *supra* at 3. The TFG did not create any civil service or "advance the political transition." *Id.* Insurgent groups within Somalia began attacking the TFG, who in turn responded with "heavy-handed" tactics. *Id.* This response included "attacks on whole

5

neighborhoods, indiscriminate violence targeting civilians, and widespread arrest and detention." *Id.* This ongoing conflict resulted in mass displacement of 700,000 Somalis in Mogadishu, portions of the capital becoming a "ghost town…businesses were destroyed, and abuses of the local population were serious and widespread." *Violent Islamist Extremism Hearing, supra* at 107-108. Within a year of the TFG moving into Mogadishu, "Somalia became the site of the world's worst humanitarian crisis." *Id.* And from 2008 to 2011 it ranked as the number one failed state in the world in Foreign Policy Magazine's annual list. *Failed State Hearing*, *supra* at 1 (statement of Hon. Christopher H. Smith).

## Argument

I. THE TERRORISM ENHANCEMENT SHOULD NOT APPLY TO MR. YUSUF SINCE HE SENT $5,000 AS A RESULT OF EXTORTION AND THEREFORE HIS FELONY NEITHER "INVOLVED" OR "WAS INTENDED TO PROMOTE" A "CRIME OF TERRORISM."

The terrorism enhancement only applies "if the offense is a felony that involved, or was intended to promote, a federal crime of terrorism." U.S.S.G. § 3A1.4. "Involved" and "intended to promote" have different meanings and in order to "avoid redundancy, the 'intended to promote' prong must be applicable in some circumstances in which the 'involved' prong is not." *U.S. v. Awan,* 607 F.3d 306, 314 (2d. Cir. 2010). It has generally been determined that an offense "involves" a crime of terrorism when the offense "includes such a crime, i.e., the defendant committed, attempted, or conspired to commit a federal crime of terrorism." *Id.* at 313. And, "intended to promote" generally means that the "offense is intended to help bring about, encourage, or contribute to a federal

6

crime of terrorism." *Id.* at 314. In regards to "crime of terrorism", "the conventional meaning of 'calculated' is 'devised with forethought'", so part A of section 2332(b)(g)(5) is met "if a defendant's purpose in committing an offense is to 'to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct'". *U.S. v. Stewart*, 590 F.3d 93, 137 (2d. Cir. 2009). In order for the terrorism enhancement to apply to Mr. Yusuf, his offense must have either "included", or been intended to "encourage", an offense in which he had the planned purpose of "influencing or affecting the conduct of government".

> A. Mr. Yusuf sent $5,000 to Somalia intending to keep Mr. Diriye safe and since he did not have the "specific intent" to "influence or affect the conduct of government" the terrorism enhancement should not apply under the "involved" prong.

Although there are no Eighth Circuit opinions on the terrorism enhancement, other circuits have addressed the issue. In 2010, the Second Circuit decided the case of *United States v. Awan*, 607 F.3d 93 (2d. Cir. 2010), where the defendant was convicted of (1) conspiring to provide material support to a conspiracy to commit murder, kidnapping, or maiming outside the United States, (2) providing material support for such purposes, and (3) the international transfer of money with the intent to promote murder and the destruction of property. *Awan,* 607 F.3d at 309. For three years, the defendant in *Awan* transferred money to the Khalistan Commando Force ("KCF"), a designated foreign terrorist organization. *Id.* at 310. The defendant claimed that the terrorism enhancement should not apply since he was acting out of a desire to gain prestige with the KCF, rather than trying to influence the conduct of government. *Id.* at 316. The court did not specifically determine whether the enhancement should apply, but seemed to suggest that it should. *Id.* at 318. During their discussion of the meaning of the "involved" prong, the

7

court stated "a defendant's offense 'involves' a federal crime of terrorism when his offense includes such a crime, i.e., the defendant committed, attempted, or conspired to commit a federal crime of terrorism." *Id.* at 313.  The court defined "calculation" as being "concerned with the object that the actor seeks to achieve through planning or contrivance" and the focus is not on the defendant but "on his 'offense', asking whether it was calculated, i.e., planned – for whatever reason or motive – to achieve the stated object." *Id.* at 317.  Taken together, the court stated that an offense "satisfies the 'involved' prong of the terrorism enhancement as long as…[the defendant] had the 'specific intent' to commit an offense that was 'calculated to influence or affect the conduct of government by intimidation or coercion." *Id*.

These concepts were also discussed in *U.S. v. Stewart,* 590 F.3d 93, (2d. Cir. 2009), where the terrorism enhancement was not applied to a defendant convicted of conspiring to defraud the United States, providing and concealing material support to a conspiracy to murder persons in a foreign country, and conspiring to provide and conceal such support.  *Stewart,* 590 F.3d at 99.  The defendant served as a translator for an inmate serving a life sentence for terrorism related offenses and who was subject to communication restrictions.  *Id.* at 103.  The translator and two co-defendants helped the inmate communicate with followers, who attempted to carry out acts of violence to influence the conduct of government.  *Id.* at 107-108.  The government argued for the terrorism enhancement; claiming that the translator's offense could fall under the "involved" prong since other participants in the conspiracy had the intent to "influence the conduct of government."  *Id.* at 138.  However, the court held that the terrorism enhancement did not apply since the "motivational requirement" could not be imputed to

8

the translator from his co-conspirator's actions. *Id.* at 138-139 . The court specifically stated "We cannot conflate [the defendant's] acts with his co-defendants' mental states." *Id.* at 139. Instead, the court found that the enhancement would only apply if the translator himself had committed a federal crime of terrorism. *Id.* at 138. This was due to the fact that the "involved" prong "incorporates 'a specific intent requirement' ". *Id.* Since there was "no evidence that [the translator] himself 'sought' to influence or affect the conduct of government", the enhancement did not apply. *Id.*

The specific intent of Mr. Yusuf's underlying offense was to provide safety for Duane Diriye, and did not include a purpose to "influence or affect the conduct of government." In *Awan*, the court seemed to suggest that the terrorism enhancement may be applicable since it was likely that the defendant specifically intended to help the KCF in their crimes of terrorism by raising money for them. *Awan*, 607 F.3d at 318. However there are some critical distinctions between *Awan* and the present case. In *Awan*, the defendant wanted to gain prestige with the terrorist organization, seeming to suggest that he agreed with their objectives. *Id.* at 316. Here, Mr. Yusuf was brought into connection with al-Shabaab after they began extorting Duane Diriye. His relationship to al-Shabaab was fundamentally different in that he was not trying to gain anything other than the protection of his friend. Further, there is evidence of explicit disagreement with al-Shabaab's practices, shown by the fact that Mr. Yusuf attempted to get at least $2,000 to go to displaced persons and injured people in area hospitals. Guilty Plea Agreement 7. While Mr. Yusuf did make comments seeming to support al-Shabaab, these statements came in the context of raising the money, attempting to get the money to Somalia, or while actually having to talk to al-Shabaab members in Somalia. Guilty Plea Agreement

9

6-7. Additionally, in *Awan*, the defendant voluntarily engaged in raising money for a period of three years. *Awan*, 607 F.3d at 310. Here, Mr. Yusuf was involuntary brought into this situation by the extortion of Mr. Diriye. Diriye BBC News 1. Further, these transactions occurred during a three month period and were limited to the $5,000 initially requested. Guilty Plea Agreement 6-8. There is also the fact that Mr. Yusuf was not arrested until over a year after his last transaction, which helps illustrate that he was not attempting to have a continuous relationship with al-Shabaab. Presentence Investigation Report 9.

In addition, the *Stewart* case illustrates that the terrorism enhancement should not be applied since Mr. Yusuf, "himself" must have " 'sought' to influence or affect the conduct of government." *Stewart,* 590 F.3d at 138. In *Stewart,* three defendants helped an inmate get messages to followers, who then attempted to commit acts of violence. *Id.* at 107-108. The court applied the enhancement to two of the defendants but not to the translator, even though he helped transfer messages that the inmate no longer supported a cease fire. *Id.* at 103. Like *Stewart*, where the court refused to apply the enhancement because they found that you "cannot conflate [the defendant's] acts with his co-defendants' mental states", here the enhancement should not apply since it would require the same process. *Id.* at 139. Although, here it may be even more egregious since it would also involve conflating Mr. Yusuf's acts with the mental states of the very people extorting him. Further, in *Stewart*, the translator was voluntarily providing translation services, knew the content of the messages, and his services were necessary for the co-defendants to carry out their actions. *Id.* at 103. The court still said that the enhancement did not apply absent proof that "[the translator] himself 'sought' to influence or affect the

10

conduct of government." *Id.* at 138.  Here, there is also evidence that Mr. Yusuf did not "himself" seek to "influence…the conduct of government."  First, there is the fact of the extortion being the cause for Mr. Yusuf's involvement, which shows that he was not seeking to "influence" a government, but rather was trying to protect a friend.  And like *Stewart*, even though Mr. Yusuf may have had knowledge of how al-Shabaab planned to use the money, that is not sufficient to say that he, "himself, 'sought'" for the money to be used in that manner.  Additionally, the fact that he knew how al-Shabaab operated and therefore attempted to get the money to go to more altruistic purposes is proof that he was not seeking to "influence the conduct of government."  Guilty Plea Agreement 7.

Overall, the enhancement should not apply here under the "involved" prong since it requires Mr. Yusuf, himself, to have the "specific intent" that his underlying offense be used to "influence or affect the conduct of government."  This "specific intent" cannot be imputed to him through the actions of others.  And here, Mr. Yusuf's "specific intent" ended at providing for the safety of Mr. Diriye and did not extend to any "crimes of terrorism" to be performed by others.

> B.  <u>The terrorism enhancement should not apply to Mr. Yusuf since no part of his offense included the purpose of promoting a crime of terrorism as he was only acting to keep Mr. Diriye safe.</u>

The "intended to promote" prong of the terrorism enhancement differs from the "involved" prong by casting "a broader net."  *Stewart,* 590 F.3d at 137.  It does this by not requiring the defendant himself to have committed a crime of terrorism, but only requiring that the defendant "intended to promote" a crime of terrorism through his offense.  While it is broader in regards to the acts of the defendant, it still focuses on intent.  Both *Awan* and *Stewart* discussed the "intended to promote" prong.  In *Awan*, the

11

court stated "an offense is 'intended to promote' a federal crime of terrorism when the offense is intended to help bring about, encourage, or contribute to a federal crime of terrorism." *Awan*, 607 F.3d at 314. Further, the courts in *Awan* and *Stewart*, amongst other Circuits, have adopted the interpretation that the "intended to promote" prong "implies that the defendant has as one purpose of his substantive count of conviction or his relevant conduct the intent to promote a federal crime of terrorism." *Id.* at 315; *see also Stewart,* 590 F.3d at 137; *U.S. v. Graham,* 275 F.3d 490, 516 (6th Cir. 2001), U.S. v. *Arnaout*, 431 F.3d 994, 1002 (7th Cir. 2005), *U.S. v. Mandhai*, 375 F.3d 1243,1248 (11th Cir. 2004).

In *Stewart,* the court did not apply the terrorism enhancement to the defendant who was a translator under either the "involved" or "intended to promote" prongs. *Stewart*, 590 F.3d at 136. In *Stewart,* the translator provided translation services allowing an inmate imprisoned for terrorism offenses to communicate with followers. *Id.* at 107-108. The court applied the terrorism enhancement to the translator's two co-defendants but not to the translator, although all three took part in the same conversations. *Id.* at 136. The crime of terrorism committed by the translator's co-defendants could not have been accomplished without the translation services and therefore it could be said that his services "helped bring about" the crime of terrorism. However, the court did not apply the terrorism enhancement since the defendant had to have the purpose of intending "to promote a crime of terrorism." *Id.* at 139. Essentially, the translator's purpose in providing translation services ended at providing the services and did not extend to his co-defendant's use of those services.

The "intended to promote" prong is not applicable to Mr. Yusuf since the purpose of his offense ended at providing for Mr. Diriye's safety. In *Stewart,* the translator provided translation services that were used by others to attempt to commit a crime of terrorism. *Id.* at 107-108. Like *Stewart*, Mr. Yusuf provided "support", in the form of money, to others who may have had the purpose of committing a crime of terrorism. However, like *Stewart*, the "intended to promote" prong should not apply here because Mr. Yusuf was not intending to "encourage" or "help bring about" a crime of terrorism. Although al-Shabaab may have intended to use the money sent by Mr. Yusuf for a crime of terrorism, Mr. Yusuf must have intended, or had the purpose, of the money being used in that manner for the terrorism enhancement to be applicable to him. There are several facts here that display that Mr. Yusuf did not have this purpose. First, Mr. Yusuf was involuntarily giving this money after Mr. Diriye was ordered to deliver it under the threat of force. This threat of force makes Mr. Yusuf's purpose even more clear than the translator in *Stewart*, where there was no threat of force to coerce the translator into providing services. Second, although Mr. Yusuf did send the requested money, he still attempted to navigate the money to be used in hospitals for anyone who fell victim to the violence in Somalia. Even if al-Shabaab members were some of the victims, this purpose is for the treatment of the injured, and not to "influence or affect the conduct of government". And third, Mr. Yusuf was not arrested until over a year after his last transaction. It seems likely that if Mr. Yusuf had the purpose of promoting a crime of terrorism, he would have continued to raise and send money.

The facts surrounding Mr. Yusuf's offense illustrate the crucial distinction between when the enhancement applies and when it does not. There is no doubting that

13

Mr. Yusuf is factually guilty of providing material support to a terrorist organization. However, the purpose of the enhancement is to hold those who intend to either commit or encourage a crime of terrorism more accountable. The fact that the enhancement does not automatically apply is recognition of the fact that people may provide material support to a terrorist organization through force, trickery, carelessness, etc. The appropriate punishment in a situation like that is simply what is mandated by the underlying offense. Here, the enhancement is not appropriate since although Mr. Yusuf provided support to al-Shabaab, he did not have the specific intent that it be used for a crime of terrorism nor did he intend to encourage a crime of terrorism.

II. THE TERRORISM ENHANCEMENT SHOULD NOT APPLY TO MR. YUSUF SINCE IN 2008 THERE WAS NO GOVERNMENT IN SOMALIA TO BE INFLUENCED OR AFFECTED.

In order for the terrorism enhancement to apply, the defendant's offense must have "involved" or been "intended to promote" a "federal crime of terrorism." U.S.S.G. § 3A1.4. The first part of the definition of "federal crime of terrorism" states that it is an "offense that is calculated to influence or affect the conduct of government." 18 U.S.C. § 2332b(g)(5)(A). In the present case, the "government" at issue is the Transitional Federal Government ("TFG") in Somalia. Guilty Plea Agreement 5. However, the TFG does not meet the qualifications to be considered a "government", making the terrorism enhancement inapplicable here.

Since 18 U.S.C. § 2332b(g)(5)(A) does not define the word "government", courts typically give the word "its ordinary or natural meaning." *Bailey v. U.S.*, 516 U.S. 137, 145 (1995). The Random House Webster's Unabridged Dictionary defines

14

"government" as "the political direction and control exercised over the actions of the members, citizens, or inhabitants of communities, societies, and states; direction of the affairs of a state, community, etc; political administration." Random House Webster's Unabridged Dictionary 2nd Ed. 826 (Random House: N.Y. 2001). Since 1991, Somalia has not had a "functioning government." *Failed State Hearing, supra* at 1 (statement of Hon. Christopher H. Smith). And it has been stated that the dictatorship of Mohammed Said Barre, which was overthrown in 1991, is "the last entity that can be plausibly described as 'the government of Somalia'." *Failed State Hearing, supra* at 40 (prepared statement of Dr. J. Peter Pham).

The dictionary definition of "government" requires "political direction and control", "direction of the affairs of a state", and "political administration." Random House, *supra* at 826. However, it has been noted that the TFG has not created any civil service or "advanced the political transition." Ken Menkhaus, Enough Project, *supra* at 3. The TFG "administers no territory" outside of a "small enclave" and "even within this restricted zone, it has shown no functional capacity to govern, much less provide even minimal services." *Failed State Hearing*, *supra* at 41 (prepared statement of Dr. J. Peter Pham). Not only has the TFG failed to create any services but they also lack effective "control exercised over the actions" of others. Random House, *supra* at 826. The "small enclave in Mogadishu" that it does control is "entirely dependent on foreign troops…to protect it." *Id.* at 41.

Further, in 2006 when they lost total control of Mogadishu, the ICU began to provide "governance that Somalis had not seen in a generation." *Violent Extremism Hearing, supra* at 106 (prepared statement of Prof. Ken Menkhaus). However, once the

15

TFG regained control of Mogadishu with Ethiopia's help, it still was unable to provide governance and within a year "Somalia became the world's worst humanitarian crisis." *Id.* at 108.  The TFG has never been able to provide the "control", "administration" or "direction" that defines a government, leading Somalia to be ranked as the number one failed state in the world from 2008 to 2011.  *Failed State Hearing, supra* at 1 (statement of Hon. Christopher H. Smith).  This distinction has led to the TFG being described as " 'not a government by any common-sense definition of the term.' "

## Conclusion

U.S.S.G. § 3A1.4 only applies if a defendant's offense "involved, or was intended to promote a federal crime of terrorism."  Under the "involved" prong, Mr. Yusuf must have had the "specific intent" that his offense "influence or affect the conduct of government."  Under the "intended to promote prong", Mr. Yusuf must have had as one purpose of his offense the intent to encourage a crime of terrorism.  Mr. Yusuf committed his underlying offense here with the specific intent to keep Mr. Diriye safe.  Further, when he could, he either distanced himself from al-Shabaab or attempted to make sure the money would go towards more humanitarian purposes, showing that no part of his underlying purpose was to "influence or affect the conduct of government."  Additionally, Somalia has been without a government since 1991 and the TFG cannot factually be considered a government.  They have not accepted the duties nor instituted the services that the definition of a government requires.  Therefore, it is not appropriate for the terrorism enhancement to be applied here.